**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | | |
|---|---|---|
| In re: | * | |
| **STANLEY SUTTON BURNS, JR.** | * | **Case No. 23-12571 MCR** |
| | * | **(Chapter 7)** |
| Debtor. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **GARY GUSEINOV** | * | |
| **1212 5ᵀᴴ Street, No. 411** | * | |
| **Santa Monica, CA 90401** | | |
| **Plaintiff** | * | |
| **v.** | * | **Adversary No:_____** |
| **STANLEY SUTTON BURNS, JR** | * | |
| **7001 Arlington Road, No. 304** | * | |
| **Bethesda, MD 20814** | | |
| | * | |
| **Defendant** | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**COMPLAINT OBJECTING TO DISCHARGE OF DEBTOR**

Gary Guseinov (the "**Plaintiff**"), by and through his undersigned counsel, pursuant to Rules 4004 and 7001(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Section 727 of Title 11 of the United State Code, hereby files this Complaint Objecting to Discharge of Debtor, and in support thereof states as follows:

**I.      Consent to Entry of Final Orders and Judgments**

1.      Pursuant to Bankruptcy Rule 7008 and Local Bankruptcy Rule 7012-1, the Plaintiff hereby consents to the entry of final orders and judgments by the Judges of the United States Bankruptcy Court for the District of Maryland.

## II.   Jurisdiction

2.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and Local Rule 402 of the United States District Court for the District of Maryland.  Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

## III.   Facts

### A. The Prepetition Judgment of Plaintiff Gary Guseinov

3.      On or about October 10, 2003, Plaintiff Gary Guseinov filed a Complaint for: i) Breach of Written Contract; ii) Anticipatory Breach of Written Contract; iii) Claim and Delivery; iv) Foreclosure; v) Fraud; vi) Intentional Interference with Existing Economic Advantage; vii) Intentional Interference with Prospective Economic Advantage; viii) Negligent Interference with Economic Advantage; ix) Trade Defamation; x) Accounting; xi) Constructive Trust; xii) Declaratory Relief (the "**Complaint**") against Synergy Ventures, Inc. ("**Synergy**") and the Debtor Stanley Burns, Jr., the Chapter 7 debtor in this instant bankruptcy case (the "**Debtor**"), in the Superior Court of California, County of Los Angeles, Central District (the "**Calif. State Court**"). The Complaint was based, in part, on an alleged breach by the Debtor and Synergy, a company owned and controlled by the Debtor and Plaintiff, of a Settlement Agreement and Mutual Release dated May 19, 2003. The parties thereafter stipulated to having their disputes against each other resolved by binding arbitration.  On or about September 12, 2005, the arbitrator rendered his Final Award of Arbitrator (the "**Arbitration Award**") in favor of the Plaintiff.  The Calif. State Court accepted the Final Award of Arbitrator and on December 7, 2005, among other relief, entered a judgment (the "**Judgment**") in favor of the Plaintiff and against Synergy and the Debtor,

individually and jointly and severally, in the amount of $5,223,980.09 plus interest at the 10 percent legal rate per annum until paid in full.

4.      Although there were subsequent issues and papers filed in the Calif. State Court concerning the amount of the Judgment after the application of certain credits, the Court resolved all issues and entered an order making clear that the amount owed under the Judgment as of March 30, 2020 was: a) $7,553,437.00 which consisted of a base judgment of $3,839,816.00; plus interest at the 10 percent legal rate per annum from July 31, 2010 through March 30, 2020 of $3,713,576.00; plus a filing fee of $45.00; and b) interest accruing thereafter at the 10 percent legal rate per annum until paid in full.

## B. Debtor's Efforts to Prevent Plaintiff from Collecting on the Arbitration Award/Judgment

5.      Only a month after the rendering of the September 12, 2005 Arbitration Award, the Debtor commenced his efforts and schemes to thwart the Plaintiff from collecting any money on account of the award.  On or about October 18, 2005, the Debtor transferred, *for no consideration*, his real property located in Thousand Oaks, County of Ventura, California (the "**California Property**"), which he owned with another person, to a company he owned i.e., Zanesville Capital, LLC, a Nevada Limited Liability Company ("**Zanesville**").  In response, the Plaintiff filed i) a complaint against the Debtor and Zanesville to set aside the transfer as fraudulent and ii) a Lis Pendens against the California Property.  Only then, on January 25, 2006, did the Debtor re-transfer the California Property back to himself and his co-owner.

6.      After the entry of the December 7, 2005 Judgment, the Debtor continued his efforts to stymie the Plaintiff's collection activity. When the Plaintiff sought to collect on the Judgment against co-Judgment debtor Synergy, the Debtor put Synergy in a Chapter 7 bankruptcy case in May 2006.

3

7.      Thereafter, upon information and belief, the Debtor moved to Tennessee where he started a new company using Synergy's assets and staff for its operations.   The Plaintiff commenced an action in the Chancery Court for Willamson Count, Tennessee in 2006 seeking to enroll the Judgment in Tennessee.  The Debtor opposed the enrollment.   Thereafter, the Plaintiff filed a motion for summary judgment on the issue of the enrollment of the Judgment and the merits of the underlying Judgment which was granted by the trial court on or about October 25, 2013.  The Debtor sought to alter or amend the trial court's order which the court denied.  The Debtor thereafter appealed the trial court's order.  On October 21, 2014, the Court of Appeals affirmed the trial court's order and found in favor of the Plaintiff on all issues.

8.      The Debtor moved to Pennsylvania and the Plaintiff enrolled the Judgment in the Court of Common Pleas of Allegheny County, Pennsylvania.

9.      Subsequently, the Debtor moved to Maryland and on approximately August 24, 2021, the Plaintiff successfully had the Judgment recorded in the Circuit Court for Montgomery County, Maryland (the "**Maryland State Court Case**") as a foreign judgment.  Commencing on February 11, 2022 and continuing thereafter, Plaintiff commenced various wage and bank account garnishment proceedings against the Debtor.

10.     On or about May 18, 2022, Plaintiff garnished $46,071.44 from one of the Debtor's financial accounts.

11.     Upon information and belief, only eight days later, on May 26, 2022, the Debtor transferred to his wife, Aminata Derra ("**Derra**"), $379,777.00 for no consideration.

12.     Thereafter, the Debtor failed to appear for his scheduled oral examination on May 31, 2022.

13.     Approximately two weeks later, on June 16, 2022, and unbeknownst to the Plaintiff, the Debtor secretly transferred 30% of his ownership interests (the "**Thirty Percent**") in Live Calls Network, LLC ("**LCN**") to his wife, Derra, for no consideration.  At all times prior to this transfer, the Debtor was the 100% owner of LCN.

14.     Upon information and belief, although the Debtor consulted with bankruptcy counsel on August 31, 2022 and thereafter, he had also consulted with bankruptcy counsel even before then in response to Plaintiff's efforts to liquidate the Judgment.

15.     Thereafter, the Debtor failed to appear for his second scheduled oral examination on September 20, 2022.

16.     It was not until after the Plaintiff sought a body attachment of the Debtor ("**Body Attachment**") on September 23, 2022 and the Debtor appeared at the Sherriff's Office that the Debtor finally agreed to show up for his oral examination.

17.     On or about November 3, 2022 and December 13, 2022, the Plaintiff garnished wages owed by LCN to the Debtor totaling $9,449.19 and $4,186.84 respectively.

18.     On April 7, 2023, the Plaintiff took the Debtor's oral examination (the "**Oral Exam**").

19.     As part of the Oral Exam, the Plaintiff's counsel asked the Debtor:

   a.   Whether he had transferred any assets to any family members in the last six months?  The Debtor responded "No."  Later in the Oral Exam the Debtor testified that he had transferred assets worth greater than $1000 to Derra.  As will be described below, the Debtor's testimony that he had not transferred any assets to family members, other than Derra, was false.

   b.   If he had any Civil War art pieces?  The Debtor responded that he had Civil War art and ephemera art…and that he had "a box of it."… that it had a value of "less than $5,000."  As will be described below, this art (the "**Civil War Art**") was not listed in the Debtor's bankruptcy Schedules.

c. Whether the Debtor was the beneficiary of any trust?  The Debtor responded "No" … "I am not a member of a trust, to my knowledge, from my parents." As will be described below, upon information and belief, the Debtor is a beneficiary of a trust and did not list this trust in his bankruptcy Schedules.

d. Whether he had any interest, in any fashion, in any business other than LCN? The Debtor responded "No".  Much later, Plaintiff's counsel confirms this and asks "So you said you are not involved in any other business, correct?"  The Debtor responded "No".

e. Unbeknownst to the Debtor, Plaintiff's counsel had reason to believe that the Debtor was, in fact, involved with another business.   As a result, the Plaintiff's counsel later asked the Debtor about another business, United Mass Tort Marketing ("**United**").  It was only then that the Debtor conceded that he was involved with United and was its Chief Revenue Officer.  The Debtor testified that United was owned by Derra and that he took no salary on account of his position.  As will be described below, the Debtor failed to include any information about United in his bankruptcy Statement of Financial Affairs.

f. What business was United in?  The Debtor testified that i) United was the "sister company" of LCN; ii) United offered the same type of services as LCN; iii) United used the LCN salespeople to make sales for United; and iv) LCN paid these salespeople their salaries but that once they made a sale for United, United paid them a bonus.  At all times during this discussion, the Debtor's testimony was focused on what United was currently doing and not solely on what it had done in the past. As will be described below, upon information and belief, the Debtor's involvement with United was a scheme to make sure sales profits that should have rightfully gone to LCN were diverted to United ---all in an effort to prevent Plaintiff from garnishing these funds had they been paid to the Debtor by LCN as owner distributions.  This is referred to as the "**United Scheme**".

20.     Plaintiff's efforts to continue to enforce the Judgment were again thwarted by the Debtor once he filed the instant bankruptcy case.

## C. **The Debtor's Bankruptcy Case**

21.     On April 14, 2023 (the "**Petition Date**"), the Debtor filed the instant Chapter 7 bankruptcy case.

**a.  Debtor's Schedules and Statement of Financial Affairs**

22.     On May 5, 2023, the Debtor filed his Schedules. [Dkt. 21] and Statement of Financial Affairs. [Dkt. 21]   Thereafter, on May 23, 2023, the eve of the 341 Meeting of Creditors, the Debtor amended his Schedules [Dkt. 32] and Statement of Financial Affairs. [Dkt. 33].

23.     On May 24, 2023, the Chapter 7 Trustee for the Debtor's case, Merrill Cohen (the "**Trustee**"), conducted the 341 Meeting of Creditors (the "**First Meeting**").  At the First Meeting, the Debtor testified that he had carefully reviewed his Schedules and Statement of Financial Affairs before signing them and that all the information in them was true and complete with the exception of a couple of minor changes that the Debtor would correct through an amendment. The Debtor's counsel explained to the Trustee that the amendment would be filed later that day.

24.     At the First Meeting, the Trustee asked the Debtor who owned the Thirty Percent in LCN.  The Debtor responded that Derra owned it.  The Trustee then asked when she had acquired the Thirty Percent interest from the Debtor and for the first time in the bankruptcy case, the Debtor revealed that he had transferred the Thirty Percent interest in LCN to Derra in June 2022. Importantly, as will be described later, this transfer was not disclosed by the Debtor in his Statement of Financial Affairs.

25.     There was not sufficient time for both the Trustee and the Plaintiff to ask questions at the First Meeting and as a result, the First Meeting was continued to June 7, 2023 (the "**Second Meeting**").

26.     The Debtor again amended his i) Schedules on June 7, 2023 [Dkt 37] and on December 29, 2023 [Dkt 114] and ii) Statement of Financial Affairs on June 7, 2023 [38] and on August 14, 2023 [71].  The Debtor's Schedules, as amended, are collectively referred to as the "**Schedules**".  Schedule A/B: Property of the Debtor's Schedules is hereinafter referred to as

"**Schedule A/B**".  Schedule I: Your Income of the Debtor's Schedules is hereinafter referred to as "**Schedule I**".  The Debtor's Statement of Financial Affairs, as amended, are hereinafter collectively referred to as the "**SOFA**".

   b.  **Debtor's Civil War Art**

27.     In response to Question 8 in Schedule A/B, the Debtor provides, under oath, that he does not own any art of any kind.  Upon information and belief, this sworn statement is false because it does not list the Civil War Art that the Debtor testified, less than a month earlier in the Oral Exam, that he owned and which had a value of less than $5,000.

   c.  **Debtor's Transfers to Family Members**

28.     Commencing with the May 23, 2023 SOFA and continuing thereafter, the Debtor responded, under oath, to SOFA Question 13, Part 5, as follows:

   a.  That within the two years before the Petition Date, he transferred gifts of more than $600.00 per person as follows:
      i.  On 12/20/22 – $750.00 to Elyse Burns;
      ii.  On 12/20/22 – $750.00 to William Burns;
      iii.  On 10/25/22 - $1,466 to Ali Haidous;
      iv.  On 10/23/22 - $1,700 to Ali Haidous;
      v.  On 10/18/22 - $1,700 to Ali Haidous;
      vi.  On 6/1/22    - $2,000 to Elyse Burns;
      vii.  On 5/28/22 - $2,000 to Elyse Burns;
      viii.  On 2/22/22 - $2,867.00 to Elyse Burns;
      ix.  On 1/24/22 - $2,867.00 to Elyse Burns;
      x.  On 12/24/21 - $3,000 to William Burns
      xi.  On 12/23/21 - $1,000 to Elyse Burns;
      xii.  On 12/22/21 - $750.00 to William Burns;
      xiii.  On 7/25/21 - $2,000 to Ali Haidous.

The Debtor's response also provides that Elyse Burns is the Debtor's daughter, William Burns is the Debtor's son and Ali Haidous is the Debtor's son-in-law (the "**Family**").

29.     The $6,366 in family transfers listed in subsection (i) through (v) above (the "**Family Transfers**") were paid by the Debtor during the six months prior to the Debtor's Oral

Exam.  Accordingly, when the Debtor swore under oath in the Oral Exam that he had not transferred any property to his family members in the six months prior thereto, that testimony was false.

### d.  Debtor's Transfers to his Wife

30.     Besides the Family Transfers to the Debtor's son, daughter, and son-in-law, the Debtor swore under oath in his response to SOFA Question 13, Part 5, that he had not made any gift within the two years prior to the Petition Date with a total value of more than $600.00 to any other person.  In addition, the Debtor swore in his response to SOFA Question 18, Part 7, that in the two years prior to the Petition Date, he had not transferred to anyone any property other than in the ordinary course of business of financial affairs.

### i.  Transfer of Thirty Percent Ownership in LCN to Wife

31.     The Debtor's SOFA is false because the Debtor failed to list his transfer of the Thirty Percent ownership in LCN to Derra.

32.     On the Debtor's Schedule I the Debtor provides that he is the "Founder & Owner" of LCN while he provides that Derra is only the "VP of HR and Admin".  Upon information and belief, the Debtor's failure to disclose that Derra was the other owner of LCN was part of his intentional efforts to conceal his transfer of the Thirty Percent to Derra so that no party could assert it was a fraudulent conveyance.

33.     Upon information and belief, the value of the Thirty Percent is greater than $600 as evidenced by i) LCN's Profit and Loss Statement for the 2022 calendar year which showed total gross profit of $1,825,907.21 and net income of $394,770.32; and ii) all information concerning owner distributions, wages, pension contributions, and other payments made by LCN to the Debtor

and Derra described below in Section h. Manipulating Live Calls Network LLC to Defeat Plaintiff's Collection Efforts.

## ii. **Transfer of Substantial Funds to Wife**

34.     The Debtor's SOFA is false because the Debtor failed to list his numerous cash transfers to Derra.

35.     It was not until the Second Meeting, when the Plaintiff's counsel peppered the Debtor with questions concerning transfers to his wife that the Debtor finally conceded that yes, he had, in fact, transferred money to Derra.  The Debtor, however, could not recall how much he had transferred to her.  The Debtor did agree to provide Plaintiff's counsel a list of payments that he made to Derra that were greater than $5,000.  Plaintiff's counsel agreed.

36.      On June 10, 2023, after reviewing SOFA Question 13, Part 5, Plaintiff's counsel requested that the Debtor's list of payments to Derra also include payments greater than $600.00 since that information should have been provided as part of the Debtor's response to this SOFA question.

37.     Later, the Debtor did provide a list to the Trustee and Plaintiff's counsel identifying monetary transfers from the Debtor to Derra in the two-year period prior to the Petition Date --- but this list only identified those transfers in an amount greater than $5,000.  These transfers are listed on Exhibit A hereto and total $529,372.00 (the "**$529,372.00 Payments**").   Significantly, the Debtor refused to identify any transfers that he made to Derra in amounts less than $5,000 and greater than $600.00 as requested by Plaintiff's counsel and SOFA Question 13, Part 5 and or Question 18, Part 7.

38.     Notwithstanding providing some of the information to the Plaintiff regarding the Debtor's transfers to Derra, the Debtor never amended his SOFA Question 13, Part 5, and Question

18, Part 7, to answer the question of what transfers he had made to Derra.   As a result, Plaintiff and all creditors and parties in interest in the case do not have the Debtor's answers to these questions.

### e. **Family Trust**

39.      Upon information and belief, the Debtor is a beneficiary of a family trust. On March 2, 2012, during the Plaintiff's efforts to collect on his Judgment, the Plaintiff's counsel took the deposition of the Debtor's father, Stanley S. Burns Sr., who lived in Alabama.   During the deposition, Mr. Burns Sr. testified that his property located at 7509 Stratford Place, Vestavia, Alabama together with some financial accounts were owned by a family trust i.e., the Burns Family Trust (the "**Trust**").   Mr. Burns Sr. testified that the Debtor was one of four beneficiaries of the Trust.

40.      The Debtor testified at the Oral Exam that his parents were still alive but that he had no interest in any trusts.

41.      In Question 25 to Schedule A/B, the Debtor provides, under oath, that he does not own any interest in a trust.  To the extent that the Debtor is still a beneficiary of the Trust then the testimony at the Oral Exam was false and the statement made under oath in the Debtor's Schedules is false.

### f.  **Debtor's Income from LCN**

42.      SOFA Question 4, Part 2, requests information regarding the amount of income that the Debtor received from his employment or from operating a business during the current year and also in the two prior calendar years.   In responding to this question, the Debtor answered "Unknown" in connection with:

> **a.** how much in wages, commissions, bonuses and tips he had received for the current year i.e., January 1 – April 14, 2023;

11

    **b.** how much in other income he had received from operating a business for the current year; and

    **c.** how amount in other income he had received from operating a business for the last calendar year i.e., January 1 to December 31, 2022.

43.    Notwithstanding both the passage of time after the end of above referenced periods and the numerous amendments of the SOFA, the Debtor has failed to answer these parts of this question.

    **g.**  **United Mass Tort Marketing**

44.    Upon information and belief, SCA Services, LLC ("**SCA**") was formed on August 9, 2021 under the laws of Wyoming.  In September 15, 2021, SCA registered as a foreign business in the State of Maryland.  On February 5, 2022, SCA filed a Trade Name Application with the State of Maryland.  Since then SCA has conducted business under the name of United Mass Tort Marketing i.e., United.   The Debtor testified that United is owned by Derra.

    **ii.**  *Prepetition* **Concealment and Use of United to Usurp LCN Opportunities**

45.    The Debtor testified several times at the Oral Exam that he had no other connection with any company other than LCN.  Later in the Oral Exam and only after Plaintiff's counsel confronted him with his knowledge of United, did the Debtor conceded that he was, in fact, connected with United and was its Chief Revenue Officer. As a result, but for Plaintiff's knowledge of United, the Debtor's prepetition deceit and concealment of his involvement with United would never have been uncovered.

46.    Upon information and belief, pursuant to the United Scheme, the Debtor and Derra operated United in an effort to usurp corporate opportunities from LCN for the sole purpose of hindering, delaying and defrauding the Plaintiff's garnishments of the Debtor.  Upon information and belief, the Debtor and Derra formed United with Derra being the sole owner so that the Debtor

had no membership interest in United that could be garnished or otherwise attached by Plaintiff. Although the Debtor was the Chief Revenue Officer, he took no salary. The Debtor and Derra then orchestrated for the LCN salesforce to steal business from LCN, and make sales for United all while they were being paid their salaries by LCN. As a result of this scheme, the Debtor and Derra were able to operate an identical business to LCN. Upon information and belief, the only difference between United and LCN was that i) all the profits and from United would be paid to Derra instead of the Debtor as it would have if the business had not been stolen from LCN; ii) the Debtor believed that the Plaintiff had no knowledge of the existence of United and the business that it was stealing from LCN. Upon information and belief, through this United Scheme, the Debtor prevented LCN from acquiring these profits that its own salesforce was generating and thus, prevented the Plaintiff from being able to garnish these profits as owner distributions from LCN.

47.     Still, the Debtor testified at the First Meeting that United had never taken any business away from LCN. Upon information and belief, this testimony at the First Meeting was false.

ii.     **Debtor's *Post Petition* Efforts to Conceal Involvement with United**

48.     SOFA Question 27, Part 11, requests, in part, information concerning any business that the Debtor owned, or was an officer, director or managing executive in the four years prior to the Petition Date. In response, the Debtor states, under oath, that the only business that he has these connections to is LCN.

49.     The Debtor's SOFA is false because the Debtor failed to list his involvement with United as its Chief Revenue Officer.

50.     In contrast to the Debtor's testimony at the Oral Exam (less than a month prior to the Petition Date) regarding United's then current operations, at the First Meeting, when asked by the Trustee about United, the Debtor testified that it was not in operation and that it had not been in operation since third or fourth quarter 2022.  While the Debtor made sure to make clear that United was Derra's company, he never disclosed to the Trustee that he was its Chief Revenue Officer.  It was only after the end of the Trustee's questions at the First Meeting and Plaintiff's counsel began peppering the Debtor with questions concerning United that the Debtor started disclosing his involvement with United.  Still, his answers were conflicting.  He first testified that he was only a consultant to Derra and not to United; then he testified that he was actually a consultant to United and not to Derra; then, after more peppered questions by Plaintiff's counsel, the Debtor revealed that he was United's Chief Revenue Officer.  Upon information and belief, the Debtor's testimony at the First meeting was i) false because he did not disclose his involvement with United and ii) made with the intent to mislead and conceal until forced to tell the truth by Plaintiff's counsel.

51.     At the First Meeting, the Debtor also testified several times that he was never a founder of United and that at all times it was Derra who founded the company.  Upon information and belief, the Debtor's testimony at the First Meeting was false because the Debtor's own LinkedIn page for United provides that he was its "Founder".  The Debtor's pre and post petition efforts to conceal his true involvement with United while at the same time stealing LCN's corporate opportunities reflect the lengths that the Debtor took to make sure i) the Plaintiff did not get an opportunity to argue that United and LCN were successor companies and that United was stealing LCN's corporate opportunities to prevent Plaintiff from successfully garnishing money

payable to the Debtor by LCN; and ii) the Trustee and other parties in interest did not have the opportunity to make the same arguments.

h.  **Manipulating Live Calls Network LLC to Defeat Plaintiff's Collection Efforts**

52.    Upon information and belief, the Debtor operated LCN in a way to shield his income and membership distributions from creditors including the Plaintiff (the "**LCN Scheme**").

53.    The Debtor formed LCN on February 16, 2018.  In addition, the Debtor was LCN's Chief Executive Officer.

54.    Upon information and belief, the Debtor, as LCN's CEO and pursuant to the LCN Scheme, hired Derra in order to channel LCN profits to another member of his household thus making sure that, at least to the extent of Derra's wages, these funds would be not subject to garnishment by the Plaintiff --- but would still be available to him via his wife.

55.    Upon information and belief, although Derra was an alleged employee of LCN, she provided few services commensurate with her high-level compensation. Upon information and belief, commencing in January 2022 and continuing through the Petition Date, LCN paid Derra as follows:

|  | **2022** | **2023**[1] | **Total** |
|---|---|---|---|
| **Wages:** | $302,000.00 | $150,383 | $452,383.00 |
| **Other Payments:** | $18,300.00 |  | $18,300.00 |

56.    Further, as stated above, on June 16, 2022, less than a month after the Plaintiff successfully garnished $46,071.44 of the Debtor's money, the Debtor transfer his Thirty Percent interest in LCN to Derra.  After that transfer, the Debtor was able to make sure that Thirty Percent of the LCN profits were not distributed to him but to Derra --- all to prevent Plaintiff from garnishing these funds.  LCN paid Derra as follows:

---

[1] This 2023 income is only through Derra's departure from LCN on or about June 6, 2023.

| | **2022** | **2023** | **Total** |
|---|---|---|---|
| **K-1 Income**: | $74,622.00 | $22,540.00 | $97,162.00 |

Upon information and belief, through this ownership transfer scheme, the Debtor was able to make sure that yet more LCN profits were protected from Plaintiff's garnishment while still being available to him via his wife.

57.    In addition, upon information and belief, the Debtor caused LCN to set up a pension plan to further funnel money into yet another account that Plaintiff could not garnish.  Upon information and belief, the pension plan permitted LCN to contribute unlimited amounts to pension accounts set up for the Debtor and Derra.  Upon information and belief, through this effort, LCN, through the Debtor, contributed the following amounts to the pension plan:

| **Year** | **Date Made** | **Contribution Amount** |
|---|---|---|
| 2020 | 1/26/2021 | 230,000.00 |
| 2021 | 3/3/2021 | 21,000.00 |
| | 5/21/2021 | 100,000.00 |
| | 9/13/2021 | 100,000.00 |
| | 10/6/2021 | 30,000.00 |
| 2022 | 5/18/2022 | 175,000.00 |
| | 8/23/2022 | 35,000.00 |
| | 9/122/22 | 82,000.00 |
| | 10/5/2022 | 60,000.00 |
| | 10/21/2022 | $100,000.00 |
| | **Total** | **$933,000 (the "Pension Transfers")** |

58.    In addition to their salaries, membership distributions, 401K and pension contributions, the Debtor treated LCN as his personal piggy bank, withdrawing additional large sums of money as needed.  Upon information and belief, based upon the Debtor's and Derra's 2021 federal tax return and the Debtor's testimony at the Second Meeting, in 2021, the Debtor's and Derra's wages totaled $405,000 but they also received an additional $159,486.00 (the "**Additional Payments**".  To be clear, the Debtor testified that the payment by LCN of $159,486

was not an owner distribution.  Notwithstanding the Debtor's counsel's representation to the Plaintiff's counsel that the Debtor would provide how much he had, in fact, received of these types of payments for the 2022 and 2023 years, the Debtor failed to provide that information as further described in the following paragraph.

59.     At the Second Meeting and as a follow up on June 10, 2023, the Plaintiff, through counsel, requested that the Debtor provide an itemization or documents showing each transfer by LCN to the Debtor, other than salary, made in the three-year period prior to the Petition Date together with a description of what the transfer was for i.e., expense reimbursement, equity distribution, other type of payment like the Additional Payments described above.  In response, the Debtor provided his bank statements for the requested period. The Debtor, however, failed to provide any description or itemization of what LCN paid to or for the benefit of the Debtor. Although the bank statements reflected substantial deposits, they did not show who the deposits were from and the Debtor failed to provide that information including what payments came from LCN or were paid by LCN to others on his behalf.

60.     Upon information and belief, Derra's actual involvement with LCN is highly suspect.  At the First Meeting, the Debtor testified that Derra helped found and start LCN from its inception in 2018 and that she held the position of Co-Manager with him.  Derra, however, testified at her deposition on August 24, 2023 that she didn't even join LCN until 2020 and prior to that she was unemployed. Further Derra testified that prior to her unemployment, she worked with people with autism and had no supervisory or management skills.  Derra testified that she didn't know the business operations when she first arrived at LCN and that she had to be trained until early 2021.  She further testified that she did not become a Co-Manager of LCN until May 2021. In conflict with these statements, Derra represented herself on LinkedIn as "VP Human Resources

& Recruitment" and not Co-Manager.  Further, the Debtor testified at the Second Meeting that Derra had not even been put on the payroll at LCN until 2021.

61.     Upon information and belief, under the LCN Scheme, Derra's involvement at LCN was at best, minimal, and at worse, a total ruse designed by the Debtor to channel money away from Plaintiff's garnishment efforts all while still making sure that money was available to him via his wife as an employee and owner at LCN.

       i.     **Debtor's Abandonment of LCN**

62.     Upon information and belief, after the Trustee refused to accept an offer of settlement from the Debtor which required a full release of Derra by the Trustee, on June 6, 2023 at approximately 10:00 p.m., the Debtor sent the Trustee an email advising the Trustee that he and Derra were resigning from LCN *effective immediately*.  Further, upon information and belief, prior to even notifying the Trustee, the Debtor notified LCN staff that he and Derra were resigning.

63.     The Debtor's and Derra's late night walk out of LCN was especially surprising since they were being paid handsomely for their management of LCN.  Upon information and belief, the Debtor and Derra were being paid $24,166.66 and $23,724.05 respectively by the estate on a monthly basis.

64.     Upon information and belief, the Trustee was completely taken off guard by the sudden resignation of the Debtor and Derra and had to spring into action quickly to try to preserve the value of LCN, the only asset of the estate.  Upon information and belief, after the walk out by the Debtor and Derra, the Trustee had no one to operate LCN and the LCN staff were in a state of chaos, not knowing whether they even had a job. Because LCN has no assets other than its short term contracts and its staff, having the staff question their job status put the entire business in jeopardy of shutting down.

65.     The Trustee scrambled to find someone to step in on an emergency basis to operate LCN and preserve the value of the business.  After discussions, and the Court's June 16, 2023 approval, the Plaintiff agreed to operate the business to help preserve the value of LCN and increase the possibility that through the sale of LCN, the Plaintiff's Proof of Claim would be paid. Since his employment by the estate, Plaintiff has continued to operate LCN until the Trustee has the opportunity to sell it.

## Objection to Discharge

## COUNT I – DENIAL OF DISCHARGE (11 U.S.C. § 727(a)(2))

66.     The Plaintiff incorporates by reference into this Count, all of the preceding paragraphs of this Complaint.

67.     Among the enumerated grounds set forth in Section 727(a) for denying a debtor's discharge are:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>> (B) property of the estate, after the date of the filing of the petition;

68.     The Debtor has engaged in this wrongful behavior with the intent to hinder, delay and defraud the Plaintiff by transferring or permitting to be **transferred** *in the one year prior to the Petition Date* the following:

a.     Those transfers constituting the $529,372 Payments which were paid to Derra and are listed on Exhibit A but only to the extent that Debtor paid them to Derra within the year prior to the Petition Date;

b.      The Thirty Percent ownership interest in LCN which the Debtor transferred to Derra on June 16, 2022;

c.      The funds that should have been paid to LCN and the Debtor, as an owner of LCN, but that were wrongfully diverted by the Debtor to United (a company owned by Derra and in which the Debtor held no ownership and took no salary) as part of the Debtor's United Scheme to defraud the Plaintiff.  The Debtor's intent to hinder, delay and defraud Plaintiff is further evidenced by the Debtor concealing his involvement with United during the Oral Exam until Plaintiff's counsel confronted him with his knowledge of the existence of United.  Only then did the Debtor reveal that the was the Chief Revenue Officer at United.  Still further, the Debtor's own LinkedIn page contradicted his testimony at the Oral Exam as that page shows he was the true "Founder" of United---not Derra.  Further, the Debtor orchestrated with Derra to organize United in the far-off State of Wyoming, a state that Plaintiff was unlikely to look at in chasing the Debtor and his assets.  Still further, the Debtor orchestrated for the staff at LCN to work for United all while being paid compensation by LCN. By usurping these LCN corporate opportunities, the Debtor made sure all profits from the United business were funneled to Derra instead of through LCN and himself, as an owner ---all to hinder, delay and defraud Plaintiff and his garnishments.

d.      The $6,366 in Family Transfers to the Debtor's Family; and

e.      The substantial funds that the Debtor caused LCN to payout to him and Derra or for their benefit pursuant to the LCN Scheme including: i) the $933,000 in Pension Transfers (but only to the extent they were paid in the one year prior to

the Petition Date); ii) the substantial amount of wages, ownership distributions, 401K contributions, and Additional Payments that the Debtor caused LCN to pay to Derra (but only to the extent that they were paid in the year prior to the Petition Date) ---- all for the purpose of making sure that the same funds would not otherwise be paid to the Debtor as an owner distribution and subject to garnishment by the Plaintiff.

69.     The Debtor has engaged in wrongful behavior with the intent to hinder, delay and defraud the Plaintiff by **transferring, removing, destroying, or mutilating, or by  permitting to be transferred, removed, destroyed, or mutilated, property of the Debtor** *after the Petition Date*.  By i) resigning and walking out of LCN late at night after the Trustee refused to accept a deal involving a full release of Derra; ii) doing so without providing the Trustee any prior notice, and iii) giving notice of his resignation to the LCN staff prior to giving notice to the Trustee, the Debtor intentionally put LCN and its operations in complete jeopardy and instigated the staff to panic and have concern over their job security.  The staff knew there was no leadership in place to run the company and that the Debtor and Derra walked out on them.  The pending doom of LCN was pivotal to this bankruptcy case.  The Debtor's ownership interest in LCN is the only asset in the case that can be liquidated in order to make any payment to creditors.  By engaging in this wrongful behavior, the Debtor negatively affected the value and salability of LCN and thus the value of his ownership interest in LCN.

70.      Indeed, it was not until the Plaintiff was approved by the Court on June 16, 2023, that measures could be taken to take control of the company and make efforts to

undo the damage that the Debtor had caused to LCN and make efforts to restore the value

of LCN and Debtor's ownership in LCN.

71.     The Debtor has engaged in wrongful behavior with the intent to hinder, delay and

defraud the Plaintiff by **concealing** his property *prepetition and/or post-petition* as follows:

      a.     His interest in the Trust, to the extent such interest still exists and the Debtor

remains a beneficiary of it, i) at the Oral Exam which occurred *in the one year prior*

*to the Petition Date*; and ii) by failing to list it on Schedule A/B *post petition*;

      b.     All of his assets by virtue of his failure to show up for his two oral

examinations *in the one year prior to the Petition Date*;

      c.     His Civil War Art by failing to list it on Schedule A/B *post petition*

notwithstanding testifying about it at the Oral Exam only seven days before the

Petition Date.

      d.     His right to profits that he should have received from LCN, had the Debtor

and United not wrongfully usurped LCN's corporate business opportunities

pursuant to the United Scheme.  The Debtor concealed these rights by failing to

disclose his involvement with United at the Oral Exam *in the one year prior to the*

*Petition Date.*  At the Oral Exam, he continuously denied any involvement in any

business other than LCN until the Plaintiff's counsel confronted the Debtor with

knowledge of his connections to United.  The Debtor also concealed this

information *post-petition* by failing to disclose his connections with United in

response to SOFA Question 27, Part 11, and in response to questions concerning

United at the First Meeting until Plaintiff's counsel peppered him with questions

concerning his role; and

e. His income that was paid to him but which he concealed *post-petition* by failing to answer question SOFA Question 4, Part 2.

72.    Notwithstanding numerous amendments to the Debtor's SOFA and Schedules in this case, the Debtor has never amended them to include this missing information.

73.    The vast number of omissions, concealments and false testimony is a further indicator that the Debtor intended his actions to hinder, delay or defraud Plaintiff and others.

74.    The fact that the Debtor swore under oath at the First Meeting that he had carefully reviewed his Schedules and SOFA and confirmed that all information therein was true and complete is a further indicator that the Debtor acted with the intent to hinder, delay or defraud the Plaintiff.

75.    The Debtor's wrongful fraudulent intent behind *the transfer and concealment* pursuant to the United Scheme is even more evident when considering that i) United used LCN's own staff to make sales for United; ii) United was formed in the State of Wyoming, a state so far away that it would be unlikely for Plaintiff to learn of it; iii) the Debtor took no salary for his position as Chief Revenue Officer; and iv) although the Debtor repeatedly denied at the First Meeting of being a founder of United, he listed himself as the Founder of United in his own LinkedIn page, which reflects that it was the Debtor who was the orchestrator of the United Scheme.

76.    The Debtor's wrongful fraudulent intent behind *the transfer and concealment* pursuant to the LCN Scheme and possible ruse that Derra was actually providing services for LCN is further indicated by the conflicting testimony as to Derra's position at LCN, whether Derra helped start LCN up, and when Derra started providing services to LCN.  While the Debtor asserted that Derra was his Co-Manager at LCN, thus justifying her large salary, his own Schedule I

evidences that Derra was not a Co-Manager but only a "VP of HR and Admin." The ruse is further evidenced by the fact that at the time that Derra is allegedly working at LCN in the year prior to the Petition Date, she was also allegedly operating United. Lastly, the operation of LCN as the Debtor's own personal piggy bank is yet further evidence of the Debtor's manipulation of LCN to hinder, delay and defraud the Plaintiff; by taking the profits out of the company, the secret payments to the Debtor could not be garnished by the Plaintiff.

77.     The Debtor's wrongful fraudulent intent behind the LCN Scheme in having LCN make the Pension Transfers is evidenced by the timing of such contributions. One contribution by LCN in the amount of $175,000 was made on May 18, 2022, the same day as the Debtor's garnishment; other payments were made very quickly thereafter and in large amounts: $35,000.00 on 8/23/2022; $82,000.00 on 9/122/22; $60,000.00 on 10/5/2022; and $100,000.00 on 10/21/2022.

78.     The Debtor's wrongful fraudulent intent behind *the transfer* of many of the $529,372 Payments to Derra and the Thirty Percent ownership to Derra is evidenced by the timing of the transfers. The Debtor transferred i) $56,000 to Derra on May 17, 2022 while the Plaintiff was trying to get the Debtor to appear at his oral examination; ii) the $379,777.00 to Derra only eight days after the Debtor's May 18, 2022 garnishment; and iii) the Thirty Percent ownership interest in LCN to Derra less than a month after such garnishment.

79.     The Debtor's repeated concealment of information, transfers and assets *only until* peppered by questions of Plaintiff's counsel who knows that the Debtor was concealing this information further establishes the Debtor's intent to hinder, delay and defraud the Plaintiff.

80.     The sheer volume and amounts of the monetary transfers concealed by the Debtor, including transfers on Exhibit A, is indicative of the Debtor's intent to hinder, delay and defraud the Plaintiff.

81.     Based upon these facts, the Debtor's discharge should be denied pursuant to Section 727(a)(2).

### COUNT II – DENIAL OF DISCHARGE (11 U.S.C. § 727(a)(4))

82.     The Plaintiff incorporates by reference into this Count, all of the preceding paragraphs of this Complaint.

83.     Among the enumerated grounds set forth in Section 727(a) for denying a debtor's discharge is:

> (4) the debtor knowingly and fraudulently, in or in connection with the case—
> (A) made a false oath or account;
> (B) presented or used a false claim;
> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

84. The Debtor knowingly and fraudulently made false oaths in this case as follows:

a.  By failing to describe his connections with United in response to SOFA Question 27, Part 11;

b.  By failing to disclose at the First Meeting i) his Chief Revenue Officer position at United in response to questions posed by the Trustee and the Plaintiff's counsel; and ii) that he was the founder of United as evidenced by his LinkedIn page;

c.  By testifying at the First Meeting that United had not been in operation since the third or fourth quarter 2022 which was in conflict with his prior testimony at the April 7, 2023 Oral Exam when he testified about United's then current operations;

d.  By failing to disclose his Civil War Art on his Schedule A/B notwithstanding describing it at the Oral Exam only a week prior to the Petition Date;

e.  By failing to disclose that he was a beneficiary of the Trust in his Schedule A/B to the extent he still is a beneficiary of the Trust;

f.  By failing to disclose his transfer of the Thirty Percent ownership interest in LCN to Derra in response to SOFA Question 13, Part 5, and Question 18, Part 7.  His efforts to conceal this fraudulent transfer is further evidenced by his Schedule I in which he described his position at LCN as Founder and Owner but describes Derra's position as only VP of HR and Admin; and

g.  By failing to disclose the $529,372 Payments he paid to Derra in response to SOFA Question 13, Part 5, and Question 18, Part 7.

85.    The Debtor's continued refusal to provide to Plaintiff any information concerning payments to Derra that were greater than $600.00 and less than $5,000.00 while knowing that the SOFA requested this information is indicative that the Debtor acted knowingly and fraudulently.

86.    The Debtor's continued refusal to amend his Schedules and SOFA even after realizing that that they were wrong so that creditors in the case who were not privy to the correct information would have the correct information is indicative that the Debtor acted knowingly and fraudulently.

87.    The sheer volume of errors and omissions in the Schedules, SOFA and in his testimony are further indicative of the Debtor's knowingly and fraudulent intent.

88.    These material errors and omissions in the Schedules and SOFA, as well as testimony at the First and Second Meeting, call into question the veracity of all the information in the Schedules and SOFA and all of the testimony provided by the Debtor.

89.    Based upon these facts, the Debtor's discharge should be denied pursuant to Section 727(a)(4).

### COUNT III – DENIAL OF DISCHARGE (11 U.S.C. § 727(a)(5))

90.    The Plaintiff incorporates by reference into this Count, all of the preceding paragraphs of this Complaint.

91.    Among the enumerated grounds set forth in Section 727(a) for denying a debtor's discharge is:

>   (4) the Debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the Debtor's liabilities;

92.    The Debtor has failed to explain satisfactorily the following:

a.    What cash he transferred to Derra in amounts less than $5,000 and greater than $600.00. Although this information is specifically requested by SOFA Question 13, Part 5, the Debtor i) failed to provide this information in his SOFA and ii) refused to provide it to Plaintiff's counsel upon her request;

b.    What i) wages, commissions, bonuses and tips and other income he had received from operating a business for the period from January 1, 2023 through April 14, 2023; ii) what other income he had received from operating a business during that time; and iii) what other income he had received from operating a business for the calendar year of January 1 to December 31, 2022.  This information was requested by SOFA Question 4, Part 2.  But the Debtor only responded "Unknown";

c.    What payments the Debtor had received from LCN other than wages, 401K and pension contributions, owner distributions.  Although the Debtor agreed to provide this information to the Plaintiff, he never did.

27

93.     Notwithstanding numerous amendments to the Debtor's SOFA in this case, the Debtor has never amended his SOFA to include this information.

94.     Without this information, the Plaintiff and other creditors are not able to discern how the Debtor allegedly spent all of his cash so that it is not available for payment to creditors.

95.     Based upon these facts, the Debtor's discharge should be denied pursuant to Section 727(a)(5).

WHEREFORE, Plaintiff, Gary Guseinov, respectfully requests that this Court enter an order denying the discharge of the Defendant, Stanley Sutton Burns, Jr. and granting such other and further relief as is just and equitable.

Dated:  January 18, 2024                    /s/ Mary Fran Ebersole
                                            Mary Fran Ebersole, Bar No. 08729
                                            Brianna Pickhardt, Bar No. 30276
                                            Tydings & Rosenberg, LLP
                                            1 E. Pratt Street, Suite 901
                                            Baltimore, MD 21202
                                            (410) 752-9700
                                            (410) 952-7414
                                            mebersole@tydings.com
                                            bpickhardt@tydings.com
                                            *Attorneys for Plaintiff*

**Exhibit A**

| | |
|---|---|
| 5-21-2021 | $15,000 |
| 6-25-2021 | $20,000 |
| 7–27-2021 | $8,000 |
| 8–26-2021 | $10,600 |
| 10-26-2021 | $6000 |
| 11-05-2021 | $7500 |
| 12-25-2021 | $10,000 |
| 2-10-2022 | $5,995 |
| 5-17-2022 | $56,000 |
| 5–26-2022 | $379,777 |
| 11-16-2022 | $10,500 |

**TOTAL  $529,372.00**